[921 NE2d 140, 893 NYS2d 448]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v MIGUEL ALEMANY, Respondent.

Argued October 13, 2009; decided November 23, 2009

**POINTS OF COUNSEL**

*Robert M. Morgenthau, District Attorney,* New York City (*Aaron Ginandes* and *Grace Vee* of counsel), for appellant. In view of the clear and convincing evidence that defendant would be undomiciled and have no community ties or support upon his release from incarceration, the hearing court properly assessed defendant 10 points under factor 15 of the risk assessment instrument on the basis that defendant's living situation was inappropriate. (*People v Buss,* 11 NY3d 553; *People v Stevens,* 91 NY2d 270; *Doe v Pataki,* 120 F3d 1263; *People v Windham,* 10 NY3d 801; *Matter of North v Board of Examiners of Sex Offenders of State of N.Y.,* 8 NY3d 745; *People v Smith,* 11 NY3d 797; *Addington v Texas,* 441 US 418; *People v Geraci,* 85 NY2d 359; *Colorado v New Mexico,* 467 US 310; *Matter of Philip,* 50 AD3d 81; *Matter of Stavisky v Koo,* 54 AD3d 432.)

*Legal Aid Society, Criminal Appeals Bureau,* New York City (*Denise Fabiano* and *Steven Banks* of counsel), for respondent. The Appellate Division agreed with the hearing court that respondent was homeless and, therefore, made no new findings of fact, instead finding that the prosecution failed to show that, based on the totality of the circumstances, respondent's living situation was "inappropriate" within the meaning of the Sex Offender Registration Act (SORA) Guidelines, a finding amply supported by the record. Furthermore, the adoption of the hearing court's per se rule, as appellant urges, that homelessness automatically results in the assessment of points for an inappropriate living situation defies the clear intent of the SORA Guidelines and violates due process. (*Matter of Buchanan v Espada,* 88 NY2d 973; *People v David W.,* 95 NY2d 130; *E.B. v Verniero,* 119 F3d 1077; *Doe v Pataki,* 3 F Supp 2d 456; *Addington v Texas,* 441 US 418; *Matter of Poldrugovaz,* 50 AD3d 117; *Colorado v New Mexico,* 467 US 310; *Matter of Westchester County*

*Med. Ctr. [O'Connor]*, 72 NY2d 517; *People v Burden*, 6 Misc 3d 1033[A], 2005 NY Slip Op 50286[U]; *People v Di John*, 48 AD3d 1302.)

**OPINION OF THE COURT**

READ, J.

We are asked to decide whether homelessness may be considered an inappropriate living situation within the meaning of risk factor 15 of the risk assessment instrument (RAI) used to rate the threat to the community posed by a defendant covered under the Sex Offender Registration Act (SORA) (Correction Law art 6-C). We hold that a hearing court may assess points under this risk factor where there is clear and convincing evidence that the defendant is undomiciled and lacks any history of living in shelters or community ties. Because there was such clear and convincing evidence in this case, Supreme Court properly adjudicated defendant Miguel Alemany a level two sex offender.

I.

At approximately 6:30 P.M. on November 29, 2005, defendant was riding a bicycle toward a woman who was jogging on the bridle path in Central Park in Manhattan. After he passed her, defendant got off the bicycle, made kissing noises, and then lunged at the woman and attempted to grab her thighs. She managed to escape defendant's grasp and ran away, with defendant in pursuit for a short distance. The woman hurried to the Central Park Police Precinct, where she reported this encounter.

She then accompanied three police officers as they patrolled the park by car, looking for defendant. They soon spotted him running down another woman on his bicycle. The police stopped defendant and arrested him; this second female was crying hysterically and shaking. Defendant admitted to the police that he had gone to Central Park to "have sex with a woman by force" because he was angry that his girlfriend had cheated on him. Defendant also told the police that he had chased after a third woman, who got away from him.

Defendant was charged in a felony complaint with two counts of attempted rape in the first degree (Penal Law §§ 110.00, 130.35 [1]), and one count of resisting arrest (Penal Law § 205.30). Prior to his arraignment on November 30, 2005, an interviewer from the New York City Criminal Justice Agency (CJA) assessed defendant's risk of flight. The CJA interviewer's

report stated that defendant had been homeless for two years; did not "report a NYC area address"; did not "have a working telephone in residence/cell phone"; provided "no contacts" to CJA; was unemployed; did not have "other sources of financial support"; and did not "provide support for others." Accordingly, defendant was "not recommended for ROR" (i.e., release on recognizance) because he was a "high risk for FTA" (i.e., failure to appear).

On January 17, 2006, defendant signed a written waiver of indictment, and agreed to be prosecuted on a superior court information charging him with attempted first-degree sexual abuse (Penal Law §§ 110.00, 130.65 [1]). That same day, defendant pleaded guilty to this crime in exchange for a sentence of six months in jail, to run concurrently with a 10-year period of probation. Defendant was informed that as a consequence of his plea he would be required to register as a sex offender pursuant to SORA.

Supreme Court put over sentencing in order for a presentence report (PSR) to be prepared by the New York City Department of Probation. The probation officer who interviewed defendant on January 17, 2006 noted on the PSR that he "appear[ed] to have minimal community ties, reporting that he [was] undomiciled and unemployed"; and "reported that he [was] currently undomiciled and was unable to provide an address or a shelter as to where he was residing."

Prior to the SORA hearing, the People prepared and provided the court and defendant with the RAI, as required by Correction Law § 168-d (3). The People sought to assess defendant 75 points on the RAI, thus classifying him presumptively as a level two sex offender. As relevant here, the People assigned defendant 10 points under risk factor 15, "Living or Employment Situation" in the SORA Guidelines promulgated by the Board of Examiners of Sex Offenders (the Board). These 10 points were critical because a score of 70 or less on the RAI results in a presumptive risk assessment of level one.

With respect to risk factor 15, the SORA Guidelines state simply that the "offender's living or employment situation is inappropriate (10 pts)." The accompanying commentary expands on the meaning of "inappropriate" as follows:

> "Many sex offenders are opportunistic criminals
> whose likelihood of reoffending increases when their
> release environment gives them access to victims or

a reduced probability of detection. An example of an offender in an inappropriate work situation is a child molester employed in an arcade or as a school bus driver. If the same offender were to live near an elementary school playground, his living environment would be inappropriate. An offender is assessed 10 points in this category if either his work or living environment is inappropriate" (Sex Offender Registration Act: Risk Assessment Guidelines and Commentary [SORA Commentary], at 17-18 [2006] [citation omitted]).

At the SORA hearing on February 17, 2006, defense counsel asserted that defendant should not be assigned points under risk factor 15. First, he stated his "understanding that . . . defendant has been advised that when he is released, that he should go to the Bellevue men's shelter as he has no other place to live and then he will be working with [a community organization] to try to find him employment." He argued that risk factor 15 was limited to "living in a place, where there is for example a child or living with someone who had been abused in the past."

The People advanced a less restrictive reading of risk factor 15. The prosecutor noted that "defendant was known to be prior to this case basically homeless and not working"; further, although "[t]he commentary in the sex offender guidelines" talks about

> "living situations or work situations that give defendant[s] access to victim[s] . . . [it] also talks about situations where there is a reduced probability of [detection] and given that [defendant] has no community ties, if he were to . . . commit this type of crime again, there is a reduced possibility of detection because he will be hard to locate [which] is a factor . . . relevant to whether he poses a risk."

Defense counsel countered that when the SORA Commentary on risk factor 15 refers to "a reduced probability of detection," this means only that a defendant "will . . . be in a certain situation where because of his relationship with possible victims, that will never be detected not because someone is homeless but because someone lives in the type of situation for example, [with] a niece and it will not be detected." He further argued that homelessness was relevant to whether defendant would be "adequately supervised," which was covered by a different risk

factor in the RAI, and "here[,] in fact, [defendant] is given five additional points [under risk factor 14] because while he will be released with supervision, and not released with no supervision, he won't be released with specialized supervision. So he already is being given points because he has a somewhat precarious supervision situation."

Supreme Court then asked if either attorney wanted an evidentiary hearing. When both responded negatively, the judge said that he "would like an opportunity to reflect on the arguments put forward" prior to making his decision.

At the next court appearance on March 3, 2006, Supreme Court summarized the arguments made by both defense counsel and the prosecutor at the SORA hearing relative to risk factor 15; discussed a case cited by defense counsel as well as another case; and noted that he had reviewed the SORA Guidelines and Commentary. Having "fully considered" the arguments, the judge adjudicated defendant a level two sex offender. Explaining his decision, he stated that "the fact that . . . defendant is undomiciled creates a very difficult situation as far as the probability of detection for any violations," and that there was no reason for a downward departure from the presumptive risk level. On March 10, 2006, Supreme Court imposed the agreed-upon sentence on defendant.

Defendant subsequently appealed his classification as a level two sex offender. On November 6, 2008, the Appellate Division modified Supreme Court's order "on the law" by reducing defendant's classification to level one. Citing *People v Ruddy* (31 AD3d 517 [2d Dept 2006], *lv denied* 7 NY3d 714 [2006]), a case handed down after Supreme Court's SORA determination here, the Court reasoned that

> "[t]he evidence established that, at most, defendant's future living situation was uncertain in that, although he was described as homeless at the time of his arrest, upon his release from incarceration under the supervision of the Department of Probation, he was advised to go to the Bellevue men's shelter where he would be assisted by a community organization in trying to find employment. This was insufficient as a matter of law to meet the People's burden of showing, by clear and convincing evidence, that defendant's living situation was inappropriate" (*People v Alemany*, 56 AD3d 251 [1st Dept 2008]).

We subsequently granted the People leave to appeal (12 NY3d 704 [2009]), and now reverse.

## II.

The "primary government interest" underlying SORA is "protecting vulnerable populations[,] and in some instances the public, from potential harm" posed by sex offenders (L 1995, ch 192, § 1 ["Legislative purpose or findings"]; *see also People v Mingo*, 12 NY3d 563, 574 [2009]). To safeguard this interest, the Legislature sought to furnish law enforcement with sufficient information to track and monitor a sex offender's whereabouts (*see e.g.* Correction Law § 168-b [1] [a]; § 168-c [2]; § 168-d [2]; § 168-e [1]; §§ 168-f, 168-j, 168-k). Concomitantly, the Board recognizes that sex offenders are more likely to reoffend if their living situation upon release "gives them access to victims or a reduced probability of detection" (SORA Commentary, at 17 [risk factor 15]).

Defendant interprets risk factor 15 as limited to a living situation that "gives [a sex offender] access to victims or opportunities to perpetrate crimes *out of the public eye* with the accompanying reduced probability of detection" (emphasis added), citing as an example a case where a child molester planned to reside with small children who were family members. The SORA Commentary gives a different example—i.e., a child molester "liv[ing] near an elementary school playground" (*id.* at 18). What both illustrations have in common is proximity to potential victims, not an increased risk that any future crimes may go unreported because of the setting in which they are carried out.

We see no reason to interpret "reduced probability of detection" to mean only access to victims, whether or not "out of the public eye." A sex offender who has no address, does not frequent a shelter or participate in any community programs and is unemployed is, for these reasons, more difficult for law enforcement authorities to locate. This living situation presents a "reduced probability of detection" because the inability to find a sex offender reduces law enforcement authorities' capacity to discover or investigate any future crimes the sex offender might commit, to connect him to those crimes, or to apprehend him. And a lessened likelihood of getting caught is thought to increase the risk of recidivism. Finally, our interpretation is consistent with SORA's overall concern with keeping track of sex offenders, and does not create any overlap between risk

factors 15 and 14, as defendant claims. The latter assigns points depending on the existence and specialization of supervision afforded a sex offender upon his release into the community, independent of his living situation (*see* SORA Commentary, at 17 [risk factor 14]).

Here, there was clear and convincing evidence that defendant was homeless and lacked any history of living in shelters or community ties. Specifically, the CJA interviewer's report, based on information provided by defendant himself, indicated that he had been homeless for two years, that he could not provide a "NYC area address" where he resided, that he did not have a residential or cell phone, and that he furnished "no contacts" to the CJA. Similarly, the PSR stated that defendant "report[ed] that he [was] undomiciled and unemployed" and was "currently undomiciled and . . . unable to provide an address or a shelter as to where he was residing."

Moreover, this evidence was not negated by defense counsel's professed "understanding" that defendant had been "advised" to go to the Bellevue men's shelter upon his release. As the Board has explained, the "Release Environment" section of the SORA Guidelines, which includes risk factor 15, "will involve an assessment of the offender's planned work and living arrangements upon his release from custody. Because those arrangements are prospective and can readily change, the Board chose not to weigh this section as heavily as others in the assessment instrument" (SORA Commentary, at 6). In short, the uncertainty inherent in a sex offender's future living arrangements has been taken into account in the weight afforded factor 15; it is not a reason to disregard factor 15 in an individual case. And as the People point out, an anomaly would be created if a sex offender planning a stable living situation may be assessed points under risk factor 15, depending upon the particular circumstances, but a homeless sex offender may never be assessed points under this risk factor simply because he might someday choose to live in a shelter.

Finally, we emphasize that we are not creating any per se rule such that a sex offender who is homeless must always be assessed points under risk factor 15. In an individual case, there may be evidence that a sex offender has a history of living in shelters, or community ties. In *Ruddy*, for example, the defendant had been renting a room and living in a "sober house" at the time of his arrest. Furthermore, the defendant stated that, upon his release from prison, he intended to resume living at

the sober house, assuming that his room had not been rented to someone else. But he also informed the probation officer that, in the event he could not return to the sober house, he would find housing in a shelter (*Ruddy*, 31 AD3d at 518-519 [Rivera, J., dissenting]). That is, the defendant's living situation was "uncertain" in *Ruddy* because it was not known at the time of the SORA hearing whether he would be living in the sober house or a shelter upon his release from incarceration; there was no evidence showing that he would likely live on the streets after he left prison, as was the case here.

Accordingly, the order of the Appellate Division should be reversed, without costs, and the order of Supreme Court reinstated.

Judges CIPARICK, GRAFFEO, SMITH, PIGOTT and JONES concur; Chief Judge LIPPMAN taking no part.

Order reversed, etc.